**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHELLE PETERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 21 C 0336** |
| **v.** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **MUNDELEIN CONSOLIDATED HIGH** | ) | |
| **SCHOOL DISTRICT NO. 120,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

In January 2021, Plaintiff Michelle Peters filed a complaint alleging that her employer, Defendant Mundelein Consolidated High School District No. 120 ("MHS"), violated the Americans with Disabilities Act. Plaintiff now seeks to amend her complaint to include allegations that MHS and several MHS employees retaliated against her after she reported the presence of black mold at the high school. Based on these allegations, she also seeks to add those employees as Defendants and bring additional claims for First Amendment retaliation, whistleblower retaliation, and illegal wiretapping. For the reasons discussed below, the court denies Plaintiff's motion for leave to file amended complaint [16], and grants MHS's motion to dismiss the original complaint [8].

## BACKGROUND

For purposes of this ruling, the court presumes the allegations of the proposed amended complaint are true. In that complaint, Plaintiff Michelle Peters ("Peters" or "Plaintiff") makes allegations against her employer, Mundelein Consolidated High School District No. 120 ("Defendant MHS") and several individuals associated with MHS: Shane McCreery, Sarah Davis, and Wendy Inman (collectively, the "proposed Defendants"). (Proposed Am. Compl., Ex. 1 to Mt'n to Am. Compl. [16-1] (hereinafter "PAC") ¶¶ 8, 11, 15.) MHS is a comprehensive, one-building high school with approximately 2,000 students and more than 100 employees. (*Id.* ¶¶ 4–

6.)   Plaintiff was hired by MHS in 2001, and asserts that "[d]uring the relevant time period," she worked as a Special Education teacher for children with a variety of disabilities.  (*Id.* ¶¶ 7, 21–22.) Proposed Defendant Sarah Davis also worked for MHS in an unspecified role.  (*Id.* ¶¶ 12–14.)  A second proposed Defendant, Wendy Inman, "acted within the scope of her employment and at the direction of [MHS] and its officials"; her position with MHS is also not specified.  (*Id.* ¶¶ 15–16.)   The final proposed Defendant, Shane McCreery, was hired as Mundelein's Director of Human Resources in August 2018, and continued in that role until (on an unidentified date) becoming Chief of Staff.  (*Id.* ¶ 8.)  Although the complaint does not make clear whether McCreery was employed by the high school or by the city, it does allege that he had final policymaking authority for the school either in his own capacity or by delegation from other unspecified individuals.  (*Id.* ¶ 9.)

At some point (the proposed complaint does not make clear), Plaintiff discovered the presence of black mold at MHS.  (*Id.* ¶ 24.)  Plaintiff has not alleged where within the school she discovered the black mold, but it alleges that she believed that the black mold was dangerous and that it threatened the health and safety of people exposed to it.  (*Id.* ¶¶ 25–26.)  Thus, sometime in November 2017, Plaintiff reported the issue to unnamed MHS officials and asked them to cure the condition. (*Id.* ¶ 27.)  Without identifying the persons she spoke to or those who should have responded, Plaintiff alleges that "Mundelein High School refused to act to cure the dangerous condition of the black mold."  (*Id.* ¶ 28.)  Plaintiff then reported the issue to at least three government agencies, explaining that she had reasonable cause to believe that the presence of black mold at MHS was a safety hazard and violated a state or federal law, rule or regulation.  (*Id.* ¶ 29.)  The complaint alleges the following reports: to the Occupational Safety and Health Administration and Illinois Environmental Protection Agency on November 26, 2017 and to the Lake County Department of Health on December 1, 2017.  (*Id.* ¶¶ 30–32.)  The complaint does not say how or whether the governmental agencies responded to these reports. MHS "knew and should have known" that Plaintiff made these reports, the complaint alleges,

without identifying which MHS official knew of the reports or how those individual[s] learned of them.  (*Id.* ¶ 33.)

MHS then began a "campaign of harassment" in retaliation for Plaintiff's report.   The complaint does not identify the individuals who spearheaded or participated in this campaign.  (*Id.* ¶ 34.)  It does allege that MHS engaged in a practice of retaliating against any MHS employee who questioned or reported the school's black mold issue.  Plaintiff alleges "on information and belief" that other unnamed employees suffered retaliation after making reports, and that this practice of retaliation was "well known among MHS teachers and staff."  (*Id.* ¶¶ 35–37.)  MHS's retaliation against Plaintiff included (without specifics) "giving her work worse assignments and unfairly criticizing her work."  (*Id.* ¶ 38.)  The campaign of retaliation also included a March 6, 2018 incident, when MHS falsely accused Plaintiff of inappropriately physically touching a student, and placed her on administrative leave. Again, Plaintiff has not identified the individual who imposed the discipline, nor has Plaintiff explained how that person became aware of her complaints about black mold.  (*Id.* ¶¶ 39–40.)

About eight months after her administrative leave, in November 2018, Plaintiff informed MHS officials (she does not say who) that she required reasonable accommodations for a disability. She does not identify the nature of the disability, but asserts that the (also unidentified) accommodations she requested would not have caused "undue hardship."  (*Id.* ¶¶ 42–43.)  In the original complaint, Plaintiff alleged that on January 17, 2019, she met with MHS officials to discuss the requested accommodations.  (Original Compl. [1] (hereinafter "OC") ¶ 19.)  The proposed amended complaint makes no mention of such a meeting nor any reference to the interactive process.  On January 22, 2019, MHS denied Plaintiff's request for reasonable accommodations. (PAC ¶ 44.)  Without identifying the person who made or communicated this decision, or the reasons offered for it, Plaintiff alleges that MHS had no legitimate, non-discriminatory reason for denying the request and did not honestly believe the reasons it gave.  (*Id.* ¶¶ 45–46.)

Plaintiff hired a lawyer to contest MHS's denial of her accommodations request. (*Id.* ¶ 47.) On April 8, 2019, about five months after Plaintiff's accommodations request and about two-and-a-half months after MHS's denial, MHS agreed to grant Plaintiff "some" of her requested accommodations (she does not further identify the accommodations MHS granted). (*Id.* ¶ 49.) It appears she returned to work at that point: "[b]etween January 2019 and April 8, 2019, while Plaintiff's requests for reasonable accommodations were denied, Plaintiff was not working, was unpaid, and was forced to use 44 days of earned benefit time [i.e., sick days]." (*Id.* ¶ 48.) The complaint alleges that "Mundelein High School refused to compensate Plaintiff for her use of 44 sick days," but does not identify any individual who made this decision. (*Id.* ¶ 50.)

The next episode of alleged wrongdoing occurred more than a year and a half later, on December 15, 2020. On that day, Shane McCreery (Mundelein's Director of Human Resources) directed Sarah Davis and Wendy Inman (whose roles at MHS are not identified) to "eavesdrop" on Plaintiff's Zoom classroom, allegedly in violation of an MHS policy.[1] (*Id.* ¶¶ 56–58.) The proposed complaint does not specify how Davis and Inman accessed the Zoom classroom, or what the "eavesdropping" entailed (for example, whether they recorded the Zoom class or just observed). There were no immediate consequences stemming from this eavesdropping incident.[2] Then, on December 21, 2020, Plaintiff filed a workers' compensation claim "related [to]

---

[1]     In response to the COVID-19 pandemic, MHS used the video conferencing platform Zoom for remote learning; this remote learning model was in place in December 2020. *See* https://www.d120.org/a-message-from-the-superintendent-update-/ (last visited February 8, 2022).

[2]     Defendant MHS denies the existence of an anti-eavesdropping policy. In its response in opposition to Plaintiff's motion for leave to amend, MHS attached a copy of the school's operative policies, including the "Acceptable Use Policy," which states: "Students and staff members have no expectation of privacy in any material that is stored, transmitted, or received via the District's Network or District computers" and "Electronic communications . . . may be monitored or read by school officials." (Ex. A to Def.'s Resp. [19] at 17.) The Faculty Handbook also provides: "Electronic communication with students should always be Transparent, Accessible, and Professional. . . . ALL electronic communication between staff and students should be considered a matter of record, part of the District archives, and/or may be accessible by others." (Ex B to Def.'s Resp. [19] at 27.)

her disability and being exposed to fragrances at work"; again, she says nothing about the nature of the disability and does not explain the implications of exposure to fragrances. (*Id.* ¶ 51.) About two weeks later, on January 8, 2021, Plaintiff amended her workers' compensation claim to add allegations "relating to the presence of black mold in the workplace." (*Id.* ¶ 52.) A week after Plaintiff amended her claim, on January 14, 2021, McCreery "disciplined" Plaintiff for "one, discrete comment made in a classroom chat"; this information about the classroom chat stemmed from Davis and Inman's eavesdropping on December 15. (*Id.* ¶¶ 53, 56.) The complaint says nothing more about the nature of the discipline or the "discrete comment" that prompted it.

Soon after the allegedly unwarranted discipline, on January 20, 2021, Plaintiff filed this lawsuit alleging violations of the Americans with Disabilities Act (ADA), naming MHS as a Defendant. In response to MHS's motion to dismiss that complaint [8], Plaintiff moved on April 30, 2021 for leave to amend the complaint [16]. Her proposed amended complaint continues to allege ADA violations, but Plaintiff has removed the allegation made earlier, that MHS engaged in the interactive process before denying her accommodations request. (OC ¶ 19.) Plaintiff also adds new proposed Defendants (McCreery, Davis, and Iman) and factual allegations (the black mold reporting and retaliation, Plaintiff's workers' compensation claims, and the Zoom eavesdropping). In addition to the ADA claim (Count I), the proposed complaint alleges First Amendment retaliation (Count II) and violations of the Illinois Whistleblower Act (Count III), the Wiretap Act (Count IV), and the Illinois Eavesdropping Act (Count V). (PAC ¶¶ 59–102.) MHS requests that this court deny leave to amend, arguing that the proposed amended pleading is futile, because it would not survive a motion to dismiss [19].

## DISCUSSION

Where a party seeks to amend her pleading more than 21 days after service of a Rule 12(b)(6) motion to dismiss, the amendment is allowed "only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). The court should "freely give leave when justice so requires," *id.*, but deny leave where the amendment is futile. *Runnion ex rel. Runnion*

*v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015). To determine whether a proposed amended complaint is futile, the court applies the legal sufficiency standard of Rule 12(b)(6). *Id.* at 524. Under that standard, the complaint must contain "factual allegations that give the defendant fair notice of the claim for relief and show the claim has 'substantive plausibility.'" *Id.* at 517 (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014)). The court accepts well-pleaded factual allegations as true and makes all reasonable inferences in favor of the plaintiff. *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020).

I.      **ADA Violations**

Plaintiff's original complaint and proposed amended complaint bring ADA claims for failure to accommodate and retaliation, relying on substantially identical factual allegations. As explained here, neither complaint adequately states a claim under the ADA.

A.      **Failure to Accommodate**

To state a failure to accommodate claim, the plaintiff must allege that: (1) she is a qualified individual with a disability; (2) her employer is aware of her disability; and (3) her employer failed to reasonably accommodate the disability. *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). The complaint alleges that Plaintiff requested unspecified accommodations for an unspecified disability in November 2018, and after MHS denied that request on January 22, 2019 for an unspecified reason, Plaintiff stopped working until April 8, 2019, when "some" of her requests were granted. (PAC ¶¶ 42–49; OC ¶¶ 17–25.)

Neither the original complaint nor the proposed amended complaint sufficiently alleges that Plaintiff had a disability that required accommodation. The ADA defines "disability" as a physical or mental impairment that substantially limits a major life activity, a record of such impairment, or being regarded as having an impairment. *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 886–87 (7th Cir. 2019). MHS correctly notes that employers do not need to accommodate individuals regarded as disabled. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 n.4

(7th Cir. 2013). MHS does not otherwise take issue with the complaint's allegation of an actual disability, but the court finds it insufficient. The complaint alleges that Plaintiff had "one or more physical and/or mental impairments within the meaning of the ADA that substantially limited one or more of her major life activities including, but not limited to, concentrating, thinking, communicating, breathing and working." (PAC ¶ 64; OC ¶ 32.) But an ADA plaintiff "must allege a specific disability," because "[t]he defendant in a disability discrimination suit does not have fair notice when the plaintiff fails to identify his disability." *Tate v. SCR Med. Transp.*, 809 F.3d 343, 346 (7th Cir. 2015); *see Lee v. Chi. Transit Auth.*, 696 F. App'x 752, 753 (7th Cir. 2017) (applying *Tate* to a failure to accommodate claim). Plaintiff's cursory allegation—which does little more than recite the ADA's definition of an actual disability—fails to identify "what exactly makes [her] disabled." *Freeman v. Metro. Water Reclamation Dist. of Greater Chi.*, 927 F.3d 961, 965 (7th Cir. 2019); *see Mohammed v. DuPage Legal Assistance Found.*, 781 F. App'x 551, 552–53 (7th Cir. 2019) (affirming dismissal where plaintiff alleged "emotional disabilities" without identifying the disabilities or alleging that they limited a major life activity).

Nor has Plaintiff alleged facts supporting an inference that she could not perform an essential function of her job without accommodation. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 852 (7th Cir. 2015) ("A plaintiff cannot state a failure to accommodate claim if 'she was able to perform all essential functions of her job without regard to her physical or mental limitations.'" (quoting *Brumfield*, 735 F.3d at 631–32)). The complaint does not identify what accommodations Plaintiff requested, which accommodations were ultimately granted, or which job functions (if any) she could not perform without those accommodations. Without such information, the court cannot draw any reasonable inferences about what accommodations Plaintiff needed to perform her job. For instance, even if the court inferred that Plaintiff left work after MHS's denial because she needed the requested accommodations, that does not explain why she could continue to work after her request and up to the denial. The complaint instead alleges that at all relevant times, Plaintiff "met or exceeded [MHS's] legitimate employment

expectations" and "was qualified to perform the essential functions of her job within the meaning of the ADA." (PAC ¶¶ 23, 67; OC ¶¶ 14, 34); *see Summerland v. Exelon Generation Co.*, 455 F. Supp. 3d 646, 662 (N.D. Ill. 2020) (dismissing where plaintiff alleged that she satisfactorily performed her job without accommodations during the period she requested accommodations). Plaintiff contends that she has met this requirement by alleging that MHS had no legitimate reason to deny the requested accommodations. (PAC ¶ 45; OC ¶ 21.) But Plaintiff herself has alleged that she met legitimate employment expectations at all times, evidently even without accommodations. Absent any information about the nature of her disability, the accommodations Plaintiff needed, the reason[s] MHS gave for its denial, or why that reason was not legitimate, there is no basis for concluding that Plaintiff has alleged a claim of failure to accommodate.

Plaintiff's proposed amended complaint does not cure these deficiencies. It offers no further information about the factual basis for Plaintiff's ADA claim; instead, it *removes* an allegation that Plaintiff and MHS officials met per the interactive process to discuss reasonable accommodations, before MHS denied and then later granted Plaintiff's request. (OC ¶ 19.) An employer who ultimately provides an accommodation may nevertheless be liable for a failure to accommodate if the delay in making that accommodation is unreasonable. *Jay v. Intermet Wagner*, 233 F.3d 1014, 1017 (7th Cir. 2000). Typically, a delay is not unreasonable if the employer, in good faith, engaged in the ADA's required interactive process with the employee to find an appropriate accommodation. *See McCray*, 966 F.3d at 622 (collecting cases holding that delays of varying length were not unreasonable because there was evidence the employer acted in good faith); *Monroe v. Jewel Food Stores, Inc.*, No. 18-CV-1499, 2021 WL 534662, at *4–5 (N.D. Ill. Feb. 12, 2021) (holding that plaintiff failed to state a claim where he alleged an eight-week delay and no bad faith).

Although reasonableness is typically a factual question best suited for summary judgment, *see McCray*, 966 F.3d at 621, Plaintiff's complaint does not permit an inference that the delay was unreasonable: again, the complaint provides no detail concerning the nature of the disability,

8

the nature of the requested accommodations, or MHS's reasons for and actions in denying and then granting those accommodations. Without this baseline information, the court cannot infer unreasonableness solely from the five-month gap between Plaintiff's request and MHS's provision of accommodations.[3] Plaintiff suggests that the proposed complaint cures these deficiencies by alleging that MHS's denial and delay was part of its campaign of retaliation for her black mold whistleblowing. The court disagrees. Assuming that evidence of a retaliatory motivation would somehow establish that the denial of accommodations was in bad faith, the proposed complaint does not identify any specific MHS official who engaged in the black mold campaign, nor any official who was involved in Plaintiff's accommodations. The court cannot even be sure that the unidentified person[s] who delayed Plaintiff's accommodations were the same unidentified person[s] who participated in the black mold retaliation. Nor does the deletion of an allegation about the interactive process change the analysis. The absence of information about such a process does not permit an inference that the process did not occur, or that it occurred in bad faith. Neither complaint states a claim of failure to accommodate.

> **B.    Retaliation**

Plaintiff also brings an ADA retaliation claim; in response, MHS challenges her standing and the claim's merits. Article III standing requires an injury in fact, caused by the defendant, and redressable by the requested judicial relief. *Gracia v. SigmaTron Int'l, Inc.*, 986 F.3d 1058, 1063–64 (7th Cir. 2021). If Plaintiff cannot establish these elements, the court lacks jurisdiction to consider the merits of her claim. *Id.* at 1063.

MHS takes issue with redressability, arguing that Plaintiff's requested relief is unavailable. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) ("[I]f in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot.").

---

[3]    Though MHS repeatedly mischaracterizes the delay as eleven weeks (the time between its denial and reversal), what matters is the five months when MHS was allegedly aware of Plaintiff's need for accommodations and nonetheless delayed providing them.

Under Seventh Circuit precedent, the only remedies available for ADA retaliation claims are those set forth in 42 U.S.C. § 2000e-5(g)(1). *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 965–66 (7th Cir. 2004). Section 2000e-5(g)(1), in turn, permits remedies "equitable in nature," such as backpay, reinstatement, or an injunction. *Id.* at 966. Contrary to MHS's contention, Plaintiff seeks backpay (not just compensatory damages) for her retaliation claim: the lost wages and sick days from the period she was not working after requesting accommodations. (PAC ¶ 70a); *see EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 629 (7th Cir. 2018) (holding that backpay is available to remedy unpaid leave).[4] Because such relief is available, Plaintiff's alleged injury is redressable.

But her claim fails to meet basic pleading requirements. ADA retaliation requires Plaintiff to allege that: (1) she engaged in protected activity, (2) she suffered an adverse action, and (3) there was a causal connection between the two. *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018). Plaintiff engaged in protected activity by requesting accommodations, *see id.* at 798, and the court will assume that her use of sick days was an adverse action. Plaintiff has not, however, adequately pleaded causation: she has not alleged that the unidentified persons who imposed the discipline were also the unidentified persons involved in her request for accommodations, or even that anyone involved in her discipline knew about the accommodations request. *See Emerson v. Dart*, 900 F.3d 469, 472 (7th Cir. 2018) ("[The defendants'] alleged misdeeds count as retaliation only if they had actual knowledge of the [protected activity]."); *Hamer v. Neighborhood Hous. Servs. of Chi.*, 897 F.3d 835, 841 (7th Cir. 2018) ("To retaliate against a complainant, decisionmakers must be aware of the complaint."). It

---

[4]    If Plaintiff files another complaint, she will eventually need to provide evidence of standing; here, that means evidence she is entitled to backpay. Because Plaintiff did not leave her employment, she must establish that her employer or workplace discrimination "forced" her to take unpaid leave. *See Costco*, 903 F.3d at 629 (allowing backpay if plaintiff's "work environment was so hostile that she was 'forced to take unpaid leave'"); *Townsend v. Indiana Univ.*, 995 F.2d 691, 693 (7th Cir. 1993) (allowing backpay if workplace sexual assaults "caused severe psychological distress that in turn caused [plaintiff] to lose work and as a result wages"). Barring evidence that someone at MHS placed her on unpaid leave, Plaintiff must prove that the lack of accommodations or some other ADA-related discrimination left her with no choice other than to use unpaid sick days.

is not even clear whether *anyone* at MHS (let alone someone who knew about Plaintiff's accommodations request) made Plaintiff stop working after the request was denied, or whether she simply made that decision herself. Without identifying at least one individual who imposed the adverse acts with a retaliatory motive, Plaintiff cannot not state a claim for retaliation.

Because Plaintiff's original complaint fails to state a claim under the ADA, and the proposed amended complaint does not cure this problem, the court dismisses Plaintiff's original Count I and denies leave to file the proposed amended Count I.

## II.    First Amendment Retaliation

Count II of Plaintiff's proposed amended complaint is a new claim for First Amendment retaliation under 42 U.S.C. § 1983, brought against MHS and proposed Defendant Shane McCreery (Mundelein's Director of Human Resources) for their alleged campaign of retaliation against Plaintiff after she reported the school's black mold problem to governmental agencies and in a workers' compensation claim. To establish First Amendment retaliation, Plaintiff must allege that (1) she engaged in First Amendment protected activity; (2) she suffered a deprivation that would likely deter future First Amendment activity; and (3) the First Amendment activity was a motivating factor in the defendant's decision to take the retaliatory action. *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017) (quotation omitted).

As a municipal employee, McCreery may be held liable under § 1983 for any First Amendment violations he participated in or caused. *See Levin v. Madigan*, 692 F.3d 607, 621 (7th Cir. 2012). But as a school district (a unit of local government), MHS is only liable for constitutional deprivations caused by municipal policies, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and there must be an "underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010). MHS has not raised a *Monell* challenge, and appears to concede that McCreery was a final policymaker such that the school district may be held responsible for his retaliatory actions. Instead, MHS argues that Plaintiff has not alleged an underlying constitutional violation because her workers'

compensation claim was not protected speech; Plaintiff, on the other hand, argues that her governmental reports *and* her workers' compensation claim are protected.

### A. Governmental Reports

The First Amendment protects a public employee's speech where she spoke "as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). The first part of this inquiry—whether the employee spoke as a citizen—turns on whether the speech was made pursuant to the employee's official duties. *Id.* at 421. This is "a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016). For reports of job-related misconduct, courts consider whether the misconduct "affect[ed] an area within her responsibility," *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013), and whether the complaint was made through an official channel, meaning "in the manner directed by official policy, to a supervisor, or to an external body with formal oversight responsibility." *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 904 (N.D. Ill. 2016).

It does not appear that the black mold reports were made pursuant to Plaintiff's official duties. Plaintiff was a teacher—not a principal or administrator—and the complaint does not allege that she had any duty to oversee safety conditions at the high school. *See Ulrey v. Reichhart*, 941 F.3d 255, 260 (7th Cir. 2019) (assistant principal's complaint about the superintendent allowing a student to possess cigarettes was within her duty to coordinate student attendance and discipline); *McArdle*, 705 F.3d at 754 (principal's oversight duties included looking after the school's reputation, adherence to district policies, and finances). Assuming that teachers have a duty to report health concerns at their school, one would expect that such reports would ordinarily be made through an official channel. *Cf. e.g.*, *Spalding*, 186 F. Supp. 3d at 905 (finding protected speech where police officers reported their colleague's misconduct "to an outside law enforcement agency, on their own initiative, while off-duty and on their own time").

12

The court will also assume that Plaintiff's reports served a public, as opposed to a private, interest. To make that determination, the court examines the statement's form, context, and content. *Connick v. Myers,* 461 U.S. 138, 147–48, (1983). The ultimate question is whether, based on these factors, the objective of the speech was to "bring wrongdoing to light," or to "further some purely private interest." *See Kubiak*, 810 F.3d at 483 (citation omitted). In this case, Plaintiff made the reports to outside agencies, rather than internally, suggesting she was promoting a public interest. *See id.* at 483. That said, the proposed complaint provides little information about the "most important" of the three factors, *id.* at 483—that is, the content of the reports, leaving the court uncertain that the reports addressed *general* concerns about black mold's impact on the high school, rather than Plaintiff's own exposure and health problems. *See Bivens v. Trent*, 591 F.3d 555, 561 (7th Cir. 2010) (concluding that plaintiff's union grievance was personal because it "arose as a result of [his] own illness and detailed his own exposure to environmental lead at the firing range"); *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 410–11 (7th Cir. 1994) (holding that a teacher's complaint about class size and student discipline was personal where it was made in response to critical performance reviews, only addressed those issues with respect to her classroom, and only requested a reduction of her class size).

That concern aside, the court concludes that, like her ADA retaliation claim, Plaintiff's First Amendment retaliation claim fails on causation. There is no First Amendment retaliation without retaliatory motive. *See, e.g.*, *Sweet v. Town of Bargersville*, 18 F.4th 273, 279–80 (7th Cir. 2021). According to the proposed amended complaint, after Plaintiff made the reports in November and December 2017, "Mundelein High School" retaliated against her in various ways. (PAC ¶¶ 34, 38–50.) But as an institutional defendant, "Mundelein High School" cannot form retaliatory intent. Plaintiff identifies no individual—not even McCreery—who knew of her black mold reports, and therefore has not alleged that anyone retaliated against her for those reports. *See Emerson*, 900 F.3d at 472; *Hamer*, 897 F.3d at 841. And McCreery did not even become Mundelein's Director of Human Resources until August 2018, eight months after Plaintiff made the reports. The mere

fact that McCreery was Mundelein's Human Resources Director (the complaint does not make clear whether he worked for the city or the school district) does not mean this court can infer that he knew about Plaintiff's out-of-school speech that occurred months before his tenure, or that he participated in any retaliatory actions because of that speech.  *See Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (complaint failed to state a claim for supervisory liability where there was "no allegation or plausible inference that [the chief of police] knew about or was personally involved in the specific conduct").

Though Plaintiff is correct that a "campaign of petty harassments" may violate the First Amendment, the complaint must still plausibly allege that someone engaged in that campaign to retaliate against her governmental reports.  *See Pieczynski v. Duffy*, 875 F.2d 1331, 1335–36 (7th Cir. 1989) (upholding a jury verdict against plaintiff's supervisors).  She has not done so.

### B.    Workers' Compensation Claim

Plaintiff's workers' compensation claim also fails to provide a basis for holding MHS or McCreery liable.  The proposed complaint alleges that six days after Plaintiff amended a workers' compensation claim "to add allegations relating to the presence of black mold in the workplace," McCreery "disciplined" her for a comment made in a Zoom classroom chat.[5]  (PAC ¶¶ 52–53.) The complaint also alleges that proposed Defendants Sarah Davis and Wendy Inman "eavesdropped" on Plaintiff's Zoom class, which provided McCreery with the basis for his discipline.  (*Id.* ¶ 56.)  This eavesdropping allegation cannot establish a constitutional deprivation because there is no causation: there are no allegations that Davis or Inman knew of the

---

[5]    Though the parties do not discuss what qualifies as an adverse employment action for purposes of First Amendment retaliation, the court notes that it is a more forgiving standard than other discrimination or anti-retaliation provisions: any deprivation likely to deter the exercise of free speech suffices, "even something as trivial as making fun of an employee for bringing a birthday cake to the office."  *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000); *see Smith v. Fruin*, 28 F.3d 646, 649 n.3 (7th Cir. 1994) ("[E]ven minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures.").  Even so, the court is skeptical that a single statement that McCreery "disciplined" Plaintiff, without any further details, is a sufficient allegation of adverse action.

14

governmental reports, which occurred three years before the eavesdropping, and Plaintiff amended her workers' compensation claim *after* the eavesdropping already occurred.

In any event, any claim based on the workers' compensation claim fails for lack of protected speech. The court reaches this conclusion without adopting MHS's position that workers' compensation claims are categorically unprotected by the First Amendment. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387–88 (2011) (explaining that speech in lawsuits, union grievances, and petitions are analyzed like other speech by public employees). But as MHS observes, in filing her workers' compensation claim, Plaintiff necessarily acted as an employee rather than in her capacity as a citizen, at least on the alleged facts. The Illinois Workers' Compensation Act (ICWA) provides the exclusive remedy for "employees" who "sustained accidental injuries arising out of and in the course of the employment," subject to some statutory exceptions. 820 ILCS 305/1(b), (d); *see Baylay v. Etihad Airways P.J.S.C.*, 881 F.3d 1032, 1038–39 (7th Cir. 2018) (describing ICWA's administrative remedy). Plaintiff offers no allegations suggesting that her claim contained any speech other than a description of an injury stemming from workplace black mold and a request for relief for that injury. Because she is required to make this request through ICWA, her workers' compensation claim is unprotected by the First Amendment. *See Houskins v. Sheahan*, 549 F.3d 480, 491 (7th Cir. 2008) (holding that a Cook County employee's speech was unprotected where she filed a misconduct complaint pursuant to General Orders).

Nor has Plaintiff adequately alleged a public interest. MHS contends that because workers' compensation claims are meant to financially compensate employees, any speech that is part of such a claim is necessarily made to advance Plaintiff's private interest. This may overstate the case; at least in some circumstances, the First Amendment protects speech made in lawsuits brought by public employees, even though lawsuits necessarily involve personal motives or remedies. *See Zorzi v. Cty. of Putnam*, 30 F.3d 885, 897 (7th Cir. 1994). But Plaintiff has not alleged a public interest, because there are no factual allegations that the black mold

complaints in her workers' compensation claim related to the general welfare of the school and public, as opposed to her own personal injuries and resulting need for financial compensation. *See Goldman v. Vill. of Oakwood Hills*, No. 18 C 50004, 2018 WL 3039748, at *5 (N.D. Ill. June 19, 2018) (holding that plaintiff's workers' compensation claim furthered a private interest where he did "not allege any speech beyond filing a claim to obtain his statutorily created right to compensation for his work injuries").[6]

Because Plaintiff has not alleged an underlying constitutional deprivation, neither McCreery nor MHS is liable under § 1983. The court does not reach MHS's argument that McCreery is entitled to qualified immunity, and concludes that Count II of the proposed complaint is futile.

### III.     Illinois Whistleblower Act

Plaintiff also seeks leave to add Count III against MHS for violating the Illinois Whistleblower Act, 740 ILCS 174/15. The Act protects employees who "had reasonable cause to believe there was a violation of a state or federal law, rule or regulation, and [ ] disclosed that to a governmental agency. . . from any employer retaliation." *Willms v. OSF Healthcare Sys.*, 2013 IL App (3d) 120450, ¶ 14, 984 N.E.2d 1194, 1196. Plaintiff points to the same allegedly retaliatory conduct underlying her First Amendment claim; these actions allegedly began in March 2018 and

---

[6]     Plaintiff attempts to distinguish *Goldman* by noting that there, the plaintiff "only alleged that he was injured, filed a workers' compensation claim and was discharged," whereas MHS's retaliation for her workers' compensation claim was allegedly part of its overall campaign of retaliation. (Pl.'s Reply [27] at 9.) But to determine whether speech is protected, the court must analyze the speech itself, not an employer's response to that speech. To the extent Plaintiff distinguishes *Goldman* because the plaintiff there was discharged (unlike her) and could therefore bring a retaliatory discharge claim under Illinois law, the court does not find this distinction material. *See Phillips v. Cont'l Tire The Americas, LLC*, 743 F.3d 475, 477 (7th Cir. 2014) (describing Illinois retaliatory discharge). Again, the dispositive issue is whether the public employee made the speech as a citizen on a matter of public concern—as relevant here, whether Plaintiff made her workers' compensation claim as directed by Illinois law, meaning to seek compensation for a workplace injury. The fact that Plaintiff was not discharged, and therefore could not bring a state law claim for alleged retaliatory discharge, does not affect that analysis.

continued through January 2021. In response, MHS argues that those actions are not materially adverse, and the claim is time-barred.

The court overrules the statute of limitations defense. The parties agree that the Tort Immunity Act's one-year statute of limitations applies to Plaintiff's claim.[7]  *See* 745 ILCS 10/8–101(a). This limitations period under that Act generally starts to run when "the interest at issue is invaded," but under Illinois's continuing violation rule, if "the tort involves continuous or repeated injurious behavior, by the same actor and of a similar nature," the limitations period does not begin "until the date the final injury occurs or the tortuous acts cease." *Taylor v. Bd. of Educ. of City of Chicago*, 2014 IL App (1st) 123744, ¶ 46, 10 N.E.3d 383, 395; *accord Logan v. City of Chicago*, 4 F.4th 529, 540 (7th Cir. 2021). The proposed Defendant's eavesdropping and discipline in January 2021 is within the one-year limitations period.[8]  The court notes, however, that the continuing violation rule does not authorize Plaintiff to challenge any earlier alleged conduct: that rule applies only to conduct by "the same actor," and Plaintiff does not allege that the proposed Defendants perpetuated any of the other allegedly retaliatory acts. *See Spalding*, 186 F. Supp. 3d at 919 (holding that plaintiff's Illinois whistleblower claim could not rest on certain defendants' conduct, because they were not the same actors who caused plaintiff's injuries within the limitations period).

---

[7]     Illinois courts have not decided whether this limitations period applies to claims under the Illinois Whistleblower Act. *See Williams v. Off. of Chief Judge of Cook Cty.*, 839 F.3d 617, 627 (7th Cir. 2016). At least one appellate court has indicated that it does, *see Taylor v. Bd. of Educ. of City of Chicago*, 2014 IL App (1st) 123744, ¶ 46, 10 N.E.3d 383, 395, and the majority of courts in this district to consider the issue have held that it does. *See Carey v. Chi. Transit Auth.*, No. 20 C 7266, 2021 WL 1853234, at *3 (N.D. Ill. May 10, 2021) (collecting cases).

[8]     This is true whether Plaintiff's original filing date (January 20, 2021) or her amended pleading's filing date (April 20, 2021) governs, an issue the parties do not discuss. *See* FED. R. CIV. P. 15(c)(1)(B) (an amended pleading relates back to the original pleading's filing date where they arise out of the same conduct, transaction, or occurrence). Additionally, MHS suggests that Plaintiff's entire retaliation claim is time-barred, because the first alleged act of retaliation occurred in March 2018. The court does not agree. If the retaliatory acts outside the limitations period were perpetuated by the same actor as those within the limitations period, the continuing violation rule applies. And if the acts were perpetuated by different actors, then the conduct within the limitations period may support an independent retaliation claim.

Notwithstanding the continuing violation rule, Plaintiff correctly points out that the Tort Immunity Act does not affect "the right to obtain relief other than damages against a local public entity," 745 ICSA 10/2-101, and therefore does not bar Plaintiff's claim to the extent she seeks backpay, reinstatement of seniority status, or other equitable relief. (PAC ¶ 88); *see Prorok v. Winnebago Cty.*, 2017 IL App (2d) 161032, ¶ 9, 92 N.E.3d 1053, 1056 (claim for backpay falls outside the Tort Immunity Act's scope); *see also Stringer v. City of Lake Forest*, No. 16 C 8991, 2017 WL 75741, at *1 (N.D. Ill. Jan. 7, 2017) (claim for front pay, backpay, and reinstatement). Assuming Plaintiff can establish this type of equitable relief is warranted for any of the alleged employment actions, her claim encompasses these otherwise-time-barred actions.

But, like the other retaliation claims, this one falters for failure to allege causation. Plaintiff cannot state a claim under the Illinois Whistleblower Act unless she pleads a retaliatory motive. *See Zuccolo v. Hannah Marine Corp.*, 387 Ill. App. 3d 561, 568, 900 N.E.2d 353, 359 (1st Dist. 2008) (analyzing retaliatory discharge and Whistleblower Act claims, and noting that for the "element of causation, the ultimate issue to be decided is the employer's motive in discharging the employee"). Since she has not identified any specific MHS official who imposed most of the retaliatory actions, or alleged that these unidentified persons knew of her black mold reports, she has not pleaded retaliation based on this conduct. *See Carter v. GC Elecs.*, 233 Ill. App. 3d 237, 243–44, 599 N.E.2d 11, 15 (2nd Dist. 1992) (affirming summary judgment against plaintiff's claim that he was fired for complaining about illegal transactions, where there was no evidence the discharging supervisor knew of his concerns). While Plaintiff identifies that the proposed Defendants eavesdropped and disciplined her, she has not alleged that they knew of the black mold reports—and this alleged retaliation occurred more than *three years* after Plaintiff made these reports.

Even if the court could somehow infer that the proposed Defendants knew of the reports, Plaintiff has not alleged that they imposed a materially adverse employment action, as required by the Illinois Whistleblower Act. *See Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901–02 (7th

Cir. 2018) (explaining that an action is materially adverse if it could cause a reasonable employee to be dissuaded from engaging in protected activity); *see also Harris v. City of Chicago*, 479 F. Supp. 743, 750 (N.D. Ill. 2020) (applying the federal "materially adverse" standard to the Illinois Whistleblower Act). It is not enough to allege "eavesdropping" and unspecified "discipline," without explaining whether or how those actions economically injured her, *see Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002), or had some "tangible job consequence." *See Boss v. Castro*, 816 F.3d 910, 918–19 (7th Cir. 2016) (explaining that anti-retaliation provisions do "not protect against petty slights, minor annoyances, and bad manners," or "[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences"). Count III of the proposed amended is futile.

## IV.    Federal Wiretap Act

Count IV of the proposed amended complaint brings a claim against the proposed Defendants under the federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*, based on allegations that McCreery "disciplined Plaintiff for one, discrete comment made in a classroom chat," and "obtained the basis for the alleged discipline by causing and directing defendants Sarah Davis and Wendy Inman to eavesdrop on Plaintiff's Zoom classroom." (PAC ¶¶ 53, 56.) Under the Wiretap Act, anyone who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," or "uses" or "discloses" the contents of unlawfully intercepted communications, violates the statute. 18 U.S.C. §§ 2511(1)(a), (c), (d); *see id.* § 2520(a) (civil remedies).

MHS first argues that Plaintiff has failed to allege an oral communication because she lacked a reasonable expectation of privacy in her Zoom communications. But the Wiretap Act's definitions of wire and electronic communications do not require a showing that the speaker had a reasonable expectation of privacy, and Zoom communications fall into these definitions. *See id.* §§ 2510(1), (12); *see also Briggs v. Am. Air Filter Co.*, 630 F.2d 414, 417 (5th Cir. 1980) (wire

communications do not need to be private to be protected); *Jandak v. Vill. of Brookfield*, 520 F. Supp. 815, 820 n.5 (N.D. Ill. 1981) (same).

Next, MHS contends that the consent exception to the Wiretap Act applies. *See* 18 U.S.C. § 2511(2)(c) (exempting interceptions by "a person acting under color of law" where one party "has given prior consent"). MHS points to its written policies, which warn teachers that they have no expectation of privacy in electronic communications and those communications may be monitored, as evidence of Plaintiff's implied consent to the eavesdropping. (Exs. A–B to Def.'s Resp. [19] at 16, 27); *see Griffin v. City of Milwaukee*, 74 F.3d 824, 827–28 (7th Cir. 1996) (finding implied consent where the defendant informed employees that workstation calls might be monitored and incoming emergency calls would be recorded, plaintiff testified she knew her calls could be monitored, and the recording system was conspicuous); *see also In re Pharmatrak, Inc.*, 329 F.3d 9, 19 (1st Cir. 2003) (explaining that implied consent can be inferred when the surrounding circumstances convincingly show that the party knowingly consented). Plaintiff, on the other hand, argues that she could not have consented, because the complaint alleges, without details, that McCreery "personally informed" MHS employees that eavesdropping "was strictly prohibited." (PAC ¶ 58.) This factual dispute suggests that implied consent, an affirmative defense, may not be a basis for dismissal of the complaint at the pleading stage. *Cf. Doe v. Smith*, 429 F.3d 706, 709 (7th Cir. 2005) (explaining that the complaint "need not anticipate or attempt to defuse potential defenses," including the defendant's consent defense).

The court need not reach the merits of MHS's consent defense, however, because Plaintiff's claim fails for another reason: she has not alleged that the proposed Defendants intercepted her communications, as required by the Wiretap Act. *See* 18 U.S.C. § 2511(1). Every court of appeals to consider the issue has concluded that to constitute an "interception" under the Wiretap Act, "the acquisition of a communication must be contemporaneous with its transmission." *Boudreau v. Lussier*, 901 F.3d 65, 77 (1st Cir. 2018) (quoting *Luis v. Zang*, 833 F.3d 619, 628 (6th Cir. 2016)); *see Epstein v. Epstein*, 843 F.3d 1147, 1149–51 (7th Cir. 2016) (declining to

reach the issue but holding that an automatic email forwarding rule constituted an interception because it was essentially contemporaneous); *United States v. Szymuszkiewicz*, 622 F.3d 701, 705–06 (7th Cir. 2010) (same).  If the communication is no longer in transit (for example, if it has been sitting in someone's email account or stored somewhere on her computer), it is governed by the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, a different statutory provision with a different statutory framework.  *See Boudreau*, 901 F.3d at 78.

The amended complaint does not adequately allege that Inman and Davis contemporaneously intercepted Plaintiff's Zoom communications.  It provides no information on how they performed their "eavesdropping," including whether they monitored the class as Plaintiff taught or instead accessed a stored recording of the class—and the latter is not an interception. *Cf. United States v. Councilman*, 418 F.3d 67, 78–79 (1st Cir. 2005) (explaining that accessing voicemail is regulated solely by the Stored Communications Act).  Moreover, the only communication mentioned in the proposed complaint is a Zoom chat comment.  Again, it is unclear whether Davis and Inman observed the comment as soon as it was posted in the Zoom chat (and the court is skeptical this even constitutes an in-transit interception), or whether they accessed the stored Zoom message well after that time (which is certainly not an interception). *Cf. Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878–79 (9th Cir. 2002) (accessing information already posted on a private website is not an interception).

Given this conclusion, Plaintiff has not stated a claim against McCreery either.  Under the Wiretap Act's civil remedy, McCreery is liable if he "intercepted, disclosed, or intentionally used [communications] in violation of this chapter."  18 U.S.C. § 2520(a); *see Shefts v. Petrakis*, 954 F. Supp. 2d 769, 777 (C.D. Ill. 2013) (holding that Wiretap Act civil liability cannot rest on procurement, conspiracy, or aiding and abetting).  Although McCreery used the Zoom chat to discipline Plaintiff, the complaint does not allege that the chat was intercepted by Inman and Davis "in violation of" the Wiretap Act, for reasons already discussed.  Because Plaintiff has not plausibly

alleged that the proposed Defendants violated the Wiretap Act, the court does not reach the issue of qualified immunity, and Count IV of the proposed amended complaint is futile.

**V.     Illinois Eavesdropping Act**

Finally, Plaintiff brings a claim under the Illinois Eavesdropping Act.  An individual commits illegal eavesdropping by surreptitiously using an eavesdropping device to overhear a "private conversation" or surreptitiously transcribing a "private electronic communication," where the eavesdropper is not a party to the communication and does not have the consent of all other parties.  720 ILCS 5/14-2(a)(1), (3); *id.* at 5/14-6 (civil remedies).  Additionally, one of the parties must have intended the communication to be private "under circumstances reasonably justifying that expectation," with a "reasonable expectation" meaning "any expectation recognized by law," including but not limited to those "established by common law, Supreme Court rule, or the Illinois or United States Constitution."  *Id.* at 5/14-1(d), (e).

The court concludes that Plaintiff, a public school teacher, did not have a reasonable expectation of privacy in the communications made to her students during her online class, just as she had no such expectation of privacy in her classroom.  Open communications to a classroom full of high school students cannot reasonably be described as private, as those students were free to repeat, record, and gossip about Plaintiff's comments.  *See Plock v. Bd. of Educ. of Freeport Sch. Dist. No. 145*, 545 F. Supp. 2d 755, 758 (N.D. Ill. 2007) ("What is said and done in a public classroom is not merely liable to being overheard and repeated, but is likely to be overheard and repeated."). And when classes are taught via videoconference platforms, it is apparent that non-intended recipients, such as parents or household members, could overhear Plaintiff's communications through the student's computer speakers, or see chat comments on the student's screen.  *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"); *see also Narducci v. Moore*, 572 F.3d 313, 320 (7th Cir. 2009) (village

finance department employee had reasonable expectation of privacy in his work phone line where he went to a non-crowded area when discussing "confidential" matters).

Given Plaintiff's role as a public employee, any privacy expectation was particularly unreasonable. "[S]ome government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987). Whether Plaintiff's classroom was virtual or in-person, it was, by its very nature, "continually entered" by students during the school day. *See id.* at 717. And most classrooms (presumably even virtual ones) are often entered by other teachers, administrators, or school staff. Given this, numerous courts have concluded that public school teachers lack any privacy expectation in their classroom. This court has not found a single opinion to the contrary. *See Marriott v. USD 204, Bonner Springs-Edwardsville*, 289 F. Supp. 3d 1235, 1240 (D. Kan. 2017) (no privacy expectation where a teacher and his family used his locked classroom outside class hours to change clothes); *Plock*, 545 F. Supp. 2d at 758 (no privacy expectation where the school videorecorded classes); *see also Khachatourian v. Hacienda La Puente Unified Sch. Dist.*, 572 F. App'x 556, 558 (9th Cir. 2014) (concluding that a teacher had no reasonable privacy expectation in his classroom because he knew searches for contraband were regularly conducted); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 182 (2d Cir. 2004) (suggesting that a teacher did not have a privacy expectation in his classroom, but did in his desk and file cabinets).

In response, Plaintiff primarily points to her allegation that McCreery orally assured her that Zoom eavesdropping was prohibited. Plaintiff provides no caselaw in support of this argument, but the court will assume that promises not to record an individual may create an expectation of privacy. *See, e.g.*, *Stumm v. Town of Pittsboro*, 355 F. Supp. 3d 751, 760 (S.D. Ind. 2018) (holding that police officers may have a reasonable expectation of privacy in their offices where management informed them those areas would not be recorded). Still, whatever McCreery may have said, MHS's written policies put Plaintiff on notice that the school was capable of monitoring her electronic communications. While Plaintiff argues that McCreery (as an alleged

policymaker) "superseded" these written polices, determining whether a privacy expectation is reasonable requires considering all of the circumstances, not just examining which policy had legal effect. In any event, regardless of McCreery's intentions, there was no reasonable basis for a belief that classroom communications were private; as noted, they could be easily repeated by students and overheard or seen by non-intended audience members. Moreover, "certain forms of public employment may diminish privacy expectations." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 671 (1989) (customs employees have diminished expectations of privacy with respect to suspicionless urine tests). Given a teacher's duty to act appropriately and transparently with students, the school's limited monitoring of classroom communications—here, a single alleged instance of eavesdropping—was not unreasonable. *See Narducci*, 572 F.3d at 321 (emphasizing that the recording lasted at least six years and the public employee alleged he made hundreds of phone calls, some involving sensitive personal matters).

The only case Plaintiff relies upon, *Plock v. Bd. of Educ. of Freeport Sch. Dist. No. 145*, 396 Ill. App. 3d 960, 920 N.E.2d 1087 (2d. Dist. 2009), is inapposite. That case held that a school's proposed policy of video-recording classrooms violated an older version of the Illinois Eavesdropping Act, which protected communications "regardless of whether one or more of the parties intended their communication to be of a private nature under circumstances justifying that expectation." *Id.* 396 Ill. App. 3d at 965–66, 920 N.E.2d at 1092 (quoting 720 ILCS 5/14-1(d) (2006)). But in 2014, the Illinois Supreme Court declared that version of the Act unconstitutionally broad, *see People v. Clark*, 2014 IL 115776 (2014); *People v. Melongo*, 2014 IL 114852 (2014), and the Illinois legislature amended the Act to make clear that it shields only those communications made with a reasonable expectation of privacy. *See* Public Act 98-1142, § 5, eff. Dec. 30, 2014. The Illinois Appellate Court's decision in *Plock*, which expressly rejected imposing an extratextual privacy limitation under the old Act, cannot support the Plaintiff's claim under the current Act. In fact, when a federal court considered whether the same classroom recording policy infringed on the same public school teacher's reasonable expectation of privacy

under the Fourth Amendment, the answer was an emphatic "no." *See Plock*, 545 F. Supp. 2d at 758.

Plaintiff also argues that because the Eavesdropping Act explicitly exempts certain acts (such as bus recordings), the court should interpret the statute as excluding all non-enumerated acts (such as classroom recordings). This argument lacks merit. The Act's list of exemptions preceded and was largely unaltered by the 2014 amendments. Continuing to interpret this list as the exclusive enumeration of all communications outside the statute's reach would effectively read out the privacy limitation—a limitation added by the Illinois legislature after the state's highest court found the old Eavesdropping Act unconstitutional. Because Plaintiff lacked a reasonable expectation of privacy in her classroom communications, her proposed state wiretapping claim is futile.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss [8] the original complaint [1] is granted. Plaintiff's motion for leave to amend her complaint [16] is denied. Plaintiff may file a second amended complaint, should she choose to do so, by March 9, 2022.


ENTER:


Dated: February 9, 2022

_____
REBECCA R. PALLMEYER
United States District Judge