**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHELLE PETERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 21 C 0336 |
| ) | |
| MUNDELEIN CONSOLIDATED HIGH ) | Judge Rebecca R. Pallmeyer |
| SCHOOL DISTRICT NO. 120, ) | |
| SHANE McCREERY, SARAH DAVIS, ) | |
| And WENDY INMAN, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michelle Peters brings an amended complaint against her employer, Mundelein Consolidated High School District No. 120 ("MHS"); Shane McCreery, an MHS administrator; and two special education teachers, Sarah Davis and Wendy Inman. (*See generally* First Am. Compl. ("FAC") [36].) Plaintiff alleges in Count I that MHS violated the Americans with Disabilities Act ("ADA") and in Count II that Defendants McCreery, Davis, and Inman violated the Federal Wiretap Act by intercepting communications made over Zoom while Plaintiff was teaching. (*Id.* ¶¶ 74– 102.) MHS has moved to dismiss the first count, which alleges two theories of liability under the Americans with Disabilities Act: that MHS failed to accommodate Plaintiff's disabilities, and that MHS retaliated against Plaintiff for ADA-protected activity. For the reasons discussed below, the court denies MHS's motion to dismiss.

**BACKGROUND**

Plaintiff initiated this case in January 2021, alleging ADA claims against MHS [1]. In response to a motion to dismiss [8], Plaintiff sought leave to file an amended complaint, adding several new counts and defendants [16]. Defendants challenged the sufficiency of the proposed amended complaint, as well; this court agreed and dismissed Plaintiff's claims without

prejudice [29].  Plaintiff has now submitted another amend complaint, asserting claims under both the ADA and the Federal Wiretap Act.  (FAC ¶¶ 74–102.)

For purposes of this ruling, the court assumes the truth of Plaintiff's allegations.  The amended complaint alleges that during the time Plaintiff worked as a special education teacher at MHS, medical professionals diagnosed her with various "serious physical impairments that substantially limited one or more of her major life activities."  (*Id.* ¶¶ 17, 20.)  Specifically, Plaintiff alleges that she has irritable bowel syndrome ("IBS"), glaucoma, and "acute and chronic asthmatic bronchitis which can be triggered by respiratory infections and exposure to certain environmental factors identified by her physicians."  (*Id.* ¶¶ 21–23.)  Plaintiff claims that during the "relevant period," she "met or exceeded MHS's legitimate employment expectations" and was "able to perform the essential functions of her position" despite her impairments.  (*Id.* ¶¶ 18, 24.)  But "due to the nature of her physical impairments," Plaintiff allegedly "required reasonable accommodations" to perform those essential functions.  (*Id.* ¶ 26.)

Beginning at some point in 2017, Plaintiff claims that she "began making requests for reasonable accommodations" to various supervisors, including Defendant McCreery.  (*Id.* ¶¶ 27–28.)  Plaintiff identifies just two requested accommodations: "a fragrance-free classroom where she is working and bathroom breaks as needed for her IBS."  (*Id.* ¶ 29.)  Although another employee with similar impairments had allegedly been granted similar accommodations, "from 2017 through November 2018, Plaintiff's efforts to obtain reasonable accommodations were largely ignored and disregarded."  (*Id.* ¶¶ 33–34.)

Then, in November 2018, Plaintiff alleges she was "exposed to a fragrance in her classroom," which, due to her impairments, resulted in her being hospitalized.  (*Id.* ¶ 35.)  Plaintiff again informed her supervisors that she needed accommodations, including a fragrance-free room and bathrooms breaks, as well as a "transfer to a case manager position to minimize contact with students who tend to wear fragrances despite being directed not to do so in Plaintiff's

classroom," an "exit plan due to exposure and medical necessity," and "a plan of action to educate others about the need for a fragrance-free environment." (*Id.* ¶¶ 36–38.)

Plaintiff alleges that MHS Assistant Superintendent Jaime DiCarlo, at an unspecified time after November 2018, "informed Plaintiff her request for reasonable accommodation was denied." (*Id.* ¶ 39.) "As a result, Plaintiff was forced to take a protected leave of absence under the Family Medical Leave Act (FMLA)."[1] (*Id.*) Plaintiff alleges that, as her FMLA leave was set to expire, she contacted her supervisors to discuss accommodations she needed to return to the classroom, and met with McCreery and DiCarlo on January 17, 2019 to discuss her request. (*Id.* ¶¶ 40, 43.) A day before that meeting, Plaintiff noticed that MHS had posted "an opening for a position to replace Plaintiff as a Special Education Teacher." (*Id.* ¶ 42.) At the January 17 meeting, McCreery and DiCarlo "did not even attempt to discuss Plaintiff's proposed accommodations," but stated they would confer internally. (*Id.* ¶¶ 44–45.) Less than a week later, McCreery wrote to Plaintiff and informed her that her request for accommodations was denied. (*Id.* ¶ 46.)

According to his letter, McCreery understood that Plaintiff had "permanent and life-threatening" medical issues, including respiratory issues triggered by environmental triggers and fragrances worn by students. (FAC Ex. 4 [36-4] ("McCreery Letter") at 1.) Thus, McCreery concluded, Plaintiff's medical condition "prevent[ed] [her] from conducting the essential functions" of her job as a special education teacher "by prohibiting [her] from teaching in the classroom" or "engaging in in-person interaction with students, co-workers, and parents due to [her] sensitivity to environmental triggers/exposures." (*Id.*) According to McCreery, MHS did not have a special education case manager role to which Plaintiff could be transferred, and, in any event, Plaintiff's condition would "similarly prevent [her] from engaging in in-person interactions" necessary to do that job, too. (*Id.*)

---

[1] Plaintiff does not define what she means by "protected leave of absence," but the court infers that she is referencing her right under the FMLA to "12 workweeks of leave during any 12-month period" due to "a serious health condition that makes the employee unable to perform one or more of the essential functions of his or her job." *See* 29 C.F.R. § 825.200(a)(4).

Although McCreery concluded that Plaintiff could not do her job, Plaintiff alleges that another teacher requested and received accommodations for the same or similar physical impairments. (FAC ¶¶ 51–52.) The complaint provides no specifics regarding the other teacher's impairments nor the accommodations this other teacher received, but does refer to them as "substantially similar." (*Id.*) Plaintiff also alleges that, contrary to McCreery's assertion in the letter, MHS did have vacant case manager positions. (*Id.* ¶ 54.)

Plaintiff alleges, further, that at the time her accommodations were denied, McCreery and the other individuals involved knew that Plaintiff had reported environmental dangers at the school to various government agencies: specifically, Plaintiff had reported that MHS was infested with "black mold" which "threatened the health and safety of people who were exposed to it." (*Id.* ¶ 55.) Plaintiff alleges that she first reported the mold to her supervisors in 2017, prior to requesting reasonable accommodations, and later reported the mold to OSHA Illinois, the Illinois EPA, and the Lake County Department of Health. (*Id.* ¶¶ 56–59.) According to Plaintiff, her supervisors knew she had made these reports because she told her supervisors about them and because MHS had been contacted by the agencies. (*Id.* ¶¶ 60–62.)

After she began reporting the mold issues, Plaintiff claims, her supervisors "have repeatedly and on a regular basis retaliated against Plaintiff," including by threatening her job, disciplining her under false pretenses, giving her "worse work assignments" and unfairly criticizing her work. (*Id.* ¶¶ 63–64.) Without offering other details, Plaintiff claims that other MHS employees suffered similar retaliation and that MHS's practice of retaliating against employees who reported mold was well known among school staff. (*Id.* ¶¶ 65–66.)

On the basis of these allegations—that MHS posted a job opening to replace Plaintiff; that McCreery wrote that Plaintiff could not perform her job while accommodating another teacher with similar disabilities, and lied about whether there was a vacant case manager position; and that supervisors retaliated against Plaintiff for reporting mold—Plaintiff alleges that her supervisors

4

"did not honestly believe the reasons given for denying Plaintiff's" accommodations and "tried to force Plaintiff to leave MHS" by denying her accommodations. (*Id.* ¶¶ 67–68.)

After her request for accommodations was denied, Plaintiff retained a lawyer. (*Id.* ¶ 69.) In February 2019, Plaintiff's lawyer contacted MHS and just two months later, McCreery signed an accommodation plan in which MHS agreed to grant Plaintiff the accommodations she needed to return to work. (*Id.* ¶¶ 70–71.) Among other things, that plan provided for a fragrance-free classroom, allowed Plaintiff to wear a mask as needed, permitted Plaintiff to take bathroom breaks as needed, and called for using special cleaning products and air purifiers in Plaintiff's classroom. (*See* FAC Ex. 5 [36-5] ("Accommodation Plan") ¶¶ 2–3, 8, 11, 13, 18.) Between January and April 2019, "while Plaintiff's requests for reasonable accommodations were denied and she was unable to return to work, Plaintiff was unpaid and she was forced to use 44 days of earned sick time." (FAC ¶ 72.)

In Count I, Plaintiff alleges that she was a qualified individual with a disability and that at all relevant times she was "qualified to perform the essential functions of her job within the meaning of the ADA." (*Id.* ¶¶ 78, 82.) Plaintiff pleads that MHS violated the ADA by refusing to make reasonable accommodations for her; and by retaliating against her in an effort to remove Plaintiff from her position. (*Id.* ¶¶ 84–86.) Defendants now move to dismiss Plaintiff's claims on both theories.[2]

## DISCUSSION

A complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) "challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) (internal

---

[2] Defendants have not moved to dismiss Count II, which alleges that Defendants McCreery, Davis, and Inman violated the Wiretap Act by intercepting a Zoom "communication" in violation of school policies. (FAC ¶¶ 87–102.) The court does not discuss those allegations because they are not at issue here.

citations omitted); *see* FED. R. CIV. P. 12(b)(6). While "detailed factual allegations are unnecessary, the complaint must have 'enough facts to state a claim to relief that is plausible on its face.'" *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Bilek v. Fed. Ins. Co.*¸ 8 F.4th 581, 586-87 (7th Cir. 2021) (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016)).) In deciding a motion to dismiss, the court accepts the complaint's factual allegations as true and draws all reasonable inferences in favor of the plaintiff. (*Id.* at 586.)

I. **Plaintiff Adequately Pleads a Failure to Accommodate Claim.**

MHS moves to dismiss Plaintiff's claim that it failed to accommodate her disabilities because, MHS argues, Plaintiff does not allege which essential functions of her job she needed accommodations to perform. (Defs.' Br. [40] at 5.) To the contrary, MHS urges, Plaintiff affirmatively pleads that she *was* qualified to perform those functions without accommodations. (*Id.* (citing FAC ¶¶ 24–25).)

To state a claim for failure to accommodate under the ADA, Plaintiff must allege that: (1) she is a qualified individual with a disability; (2) her employer is aware of her disability; and (3) her employer failed to reasonably accommodate the disability. *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). "A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'" *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting 42 U.S.C. § 12111(8)). Importantly, if the proposed accommodation does not make it possible for the employee to perform the essential functions of her job, the employee is not a "qualified individual" under the ADA. *Id.* On the other hand, if an employee can perform the essential functions of her job without the proposed

6

accommodation, she is likewise not a "qualified individual." *See Brumfield*, 735 F.3d at 632–33 ("[S]ince the employee's limitations do not affect her ability to perform those essential functions, the employer's duty to accommodate is not implicated.").

MHS's motion presents just one argument: because Plaintiff affirmatively pleads that, despite her impairments, she was "able to perform the essential functions of her position"—including those "identified in the job description for her position"—she is not a qualified individual under the ADA. (*See* Defs.' Br. at 5 (citing FAC ¶¶ 24–25).) Put differently, because Plaintiff alleges she could perform the essential functions of her job, Plaintiff did not require accommodations to do her job and MHS's failure to provide accommodations cannot therefore support an ADA claim. (*Id.*)

The court rejects MHS's argument at this stage. True, Plaintiff pleaded that she could "perform the essential functions of her position" as listed in the job description for her position. (FAC ¶¶ 24–25.) But just one paragraph later, she explained that "due to the nature of her physical impairments, in order to work as a Special Education Teacher, Plaintiff required reasonable accommodations to perform the essential functions of her position." (*Id.* ¶ 26.) Plaintiff could well have worded her claim more artfully, but the court agrees with her that MHS's challenge is based on an "unreasonably narrow reading" of the complaint. (Pl.'s Opp. Br. [50] at 5.) Read in context, and drawing reasonable inferences in her favor, the court concludes that Plaintiff has sufficiently pleaded that she could perform the essential functions of her job, but only with accommodations. That makes this case different than *Brumfield*, where the plaintiff's alleged disability was "irrelevant" because she was "fully qualified for the job without accommodation." 735 F.3d at 632–34 (rejecting failure to accommodate claim where four psychological evaluations deemed plaintiff fit to serve as a police officer, despite alleged "psychological problems").

The court also rejects MHS's claim that Plaintiff "did not plead which essential functions of her position (if any) she could not perform without the accommodations sought or how her disabilities prevented her from performing such essential functions." (Defs.' Reply at 1.) The

7

operative complaint goes beyond the earlier pleadings; it offers sufficient explanation of Plaintiff's disability and alleges facts from which the court can draw reasonable inferences about how that disability prevented her from performing essential functions of her job. For example, Plaintiff alleges that she was diagnosed with "acute and chronic asthmatic bronchitis" which can be triggered by "environmental factors." (FAC ¶ 21.) By further alleging that she requested a "fragrance-free classroom" to accommodate her disability (*id.* ¶ 29), the court can reasonably infer that Plaintiff was unable to teach in a classroom without such an accommodation (*see* FAC Ex. 3 [36-3] (listing special education teacher responsibilities, which included providing "direct assistance" to students)). Significantly, Plaintiff has alleged that when she was exposed to a fragrance in her classroom—after MHS failed to provide accommodations—she was hospitalized. (FAC ¶ 35.) Though Plaintiff's allegations could have been clearer, the court can reasonably infer from her complaint that Plaintiff's apparently serious sensitivity to fragrances required accommodations from MHS. *See Iqbal*, 556 U.S. at 679 (in determining whether a complaint states a plausible claim, the court must "draw on its judicial experience and common sense").

      Finally, MHS argues that the letter Plaintiff attached to her complaint from Defendant McCreery "tends to establish Plaintiff was not a 'qualified individual' for purposes of the ADA" because she could not perform the functions of her job even with an accommodation. (Defs.' Reply at 3–4.) Put differently, MHS asserts that Plaintiff's disability was so profound that no accommodation could allow her to resume working. The court rejects MHS's effort to have it both ways. Plaintiff cannot both be capable of working without accommodations *and* so disabled that she could not work even with accommodations, as Defendants assert just paragraphs apart. While the McCreery letter states that MHS officials determined that Plaintiff's medical condition precluded her from teaching in a classroom (McCreery Letter at 1), Plaintiff herself nowhere endorses that view. Plaintiff exhibited the McCreery letter for the purpose of establishing when and how MHS denied her accommodations, not as evidence of what her disability did or did not prevent her from doing. (*See* FAC ¶ 46 (citing McCreery Letter).)

The court recognizes that, where a party relies on an exhibit, the court may "independently examine the document and form [its] own conclusions" about that exhibit.. *See McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) (cited in Defs.' Reply at 5). But having conducted that independent analysis, the court concludes that McCreery's letter does not "incontrovertibly contradict the allegations in the complaint." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). In short, the court cannot credit MHS's assertion that Plaintiff was unable to perform her job over Plaintiff's allegation that she could resume teaching if given reasonable accommodations. Considering the allegation that MHS, through McCreery, agreed to accommodate Plaintiff's disabilities and return her to work just a few months after he sent the letter (FAC ¶ 71), it would be particularly inappropriate to dismiss Plaintiff's claim based on McCreery's (seemingly mistaken) assertions.

The court recognizes that while Plaintiff alleges that she began requesting accommodations at some unspecified point in 2017 (*id.* ¶ 27), she also alleges that she continued to work even while her "efforts to obtain reasonable accommodations were largely ignored and disregarded." (*Id.* ¶ 34.) According to her factual allegations, it was only after her November 2018 hospitalization that Plaintiff was forced to use earned sick time and take FMLA and other unpaid leave. (*Id.* ¶¶ 35–36, 39, 47, 68, 72.) MHS correctly notes that allegations that Plaintiff "was able to perform the essential functions of her job without her requested accommodation" would defeat her ADA claim. Defs.' Reply at 7 (citing *Summerland v. Exelon Generation Co.*, 455 F. Supp. 3d 646, 662 (N.D. Ill. 2020).) But at this stage, the court cannot conclude that Plaintiff was, in fact, able to perform those functions without accommodations. The allegation that she required hospitalization because MHS failed to accommodate her suggests that she did need accommodations to work. Plaintiff's claim for lost wages will be limited, but the court is not prepared to conclude that Plaintiff became a "qualified individual" only when a serious risk to her materialized, rather than when that she first communicated her concerns to MHS.

9

II. **Plaintiff Can Also Maintain a Retaliation Claim.**

Next, MHS argues that Plaintiff has not alleged an ADA retaliation claim because: (1) her allegations about black mold are not tied to her disability; (2) MHS's decision to deny accommodations cannot sustain a retaliation claim; and (3) any other retaliatory allegations are insufficiently detailed. (*See* Defs.' Br. at 7–10; Defs.' Reply at 5–8.)

To state a claim for retaliation under the ADA, Plaintiff must allege that: (1) she engaged in protected activity, (2) she suffered an adverse action, and (3) there was a causal connection between the two. *Rowlands v. United Parcel Serv.*, 901 F.3d 792, 801 (7th Cir. 2018). Protected activities are "those statutorily protected under the ADA," *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550-51 (7th Cir. 2017), like "filing a charge with the EEOC, requesting a reasonable accommodation, or otherwise opposing disability discrimination." *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 766 (N.D. Ill. 2020). Defendants contend that Plaintiff fails to plead at least one of those elements in each of her retaliation theories.

On Plaintiff's first theory—that MHS retaliated because of her reports about black mold at MHS—the court agrees with MHS that those allegations do not establish that Plaintiff's reports were protected activity. Even if Plaintiff has sufficiently alleged an adverse action causally connected to her mold complaints—which the court will assume for purposes of this order—Plaintiff makes no effort to tie those complaints either to her disability or to her request for accommodations. If anything, Plaintiff's allegations suggest that the retaliation she suffered was due to her complaints about environmental hazards rather than her personal disability concerns. Thus, Plaintiff asserts that "other MHS employees who questioned or reported the black mold also suffered the [same] or similar type of retaliation" and that MHS's "practice of retaliating" because of mold complaints was "well-known." (FAC ¶¶ 65–66.) Plaintiff does not suggest those other employees also had disabilities or made requests for accommodations. Because she has not directly alleged a connection between the black mold reports and her disability, Plaintiff cannot sustain an ADA claim based on retaliation she may have suffered because of those reports.

Plaintiff seems to recognize as much, focusing her opposition almost exclusively on her second theory, that she engaged in protected activity by requesting reasonable accommodations.[3] (Pl.'s Opp. Br. at 8 (citing FAC ¶¶ 27–31, 36–38).) Requesting accommodations, of course, is a quintessential protected activity. *See Elzeftawy*, 477 F. Supp. 3d at 766.

As for adverse action, Plaintiff suggests that, because of MHS's retaliation, she "lost pay," accrued "unnecessary expenses," "lost earned sick days" and faced "harassment and discipline." (Pl.'s Opp. Br. at 8 (citing FAC ¶¶ 47, 69, 72–73, 84(f)).) Plaintiff cannot state a retaliation claim merely by pleading that "MHS . . . [d]isciplined and harassed Plaintiff in retaliation for making an accommodation request." (Pl.'s Opp. Br. at 8, 10 (citing FAC ¶ 84(f)).) Plaintiff must offer some explanation of the form that discipline and harassment took. She has failed to do so, even on this, her third attempt to plead this claim. In a single sentence in her opposition, Plaintiff suggests that Defendants intercepted her electronic communications—the basis for her Wiretap Act claim— to "manufacture reasons to discipline her" and seems to imply that this interception could also form the basis of a retaliation claim. Plaintiff offers no facts (or even meaningful argument) to suggest that Defendants' alleged interception had anything to do with her disability, so the court cannot find that Plaintiff has pleaded adverse action on that basis.

Plaintiff is correct, however, that "[b]eing forced to take an unpaid leave of absence" is a material adverse employment action. *See Arizanovska v. Wal-Mart* 682 F.3d 698, 704 (7th Cir. 2012) (cited in Pl.'s Opp. Br. at 9). Plaintiff has therefore pleaded a protected activity (her request for accommodations) and an adverse action (being forced to take unpaid leave). The question is whether Plaintiff has pleaded a causal connection between the two. Though a close call, the court

---

[3] Though Plaintiff vaguely references "other ways" she engaged in protected activity, she neither specifies them nor cites the portions of her complaint about black mold. (*See* Pl.'s Opp. Br. at 8.)

finds that Plaintiff has pleaded sufficient facts for the court to infer that MHS's real motive for denying accommodations was retaliatory.

At the outset, the court agrees with MHS that Plaintiff must do more than simply plead that she was denied accommodations that she should have been granted. Put differently, "[e]vidence of non-accommodation . . . cannot do 'double duty' as evidence of an adverse employment action." *Avet v. Dart*, No. 14-cv-4555, 2016 WL 757961, at *6 (N.D. Ill. Feb. 26, 2016); *see also Sheahan v. Dart*, No. 13-cv-9134, 2015 WL 1915246, at *6 (N.D. Ill. Apr. 23, 2015) ("[T]he denial of such requests [for accommodation] can hardly be considered unlawful retaliation for the act of requesting them"); *Imbody v. C & R Plating Corp.*, No. 08-cv-0218, 2009 WL 196251, at *4 (N.D. Ind. Jan. 23, 2009) ("[T]he mere denial of the accommodation claimed to violate the substantive anti-discrimination provisions of the ADA simply cannot support a retaliation claim.").

An initial read of Plaintiff's complaint suggests just that kind of circular logic. In the paragraph Plaintiff cites as evidence of "lost pay," for example, she specifically alleges that "the denial of Plaintiff's request for reasonable accommodations forced Plaintiff to take unpaid leave." (FAC ¶ 47.) Likewise, Plaintiff alleges that "while Plaintiff's requests for reasonable accommodations were denied and she was unable to return to work, Plaintiff was unpaid and she was forced to use 44 days of earned sick time," for which McCreery and MHS refused to compensate her. (FAC ¶¶ 72–73; *see also* FAC ¶ 69 (alleging that Plaintiff incurred costs to hire a lawyer to contest MHS's denial of accommodations).)

But Plaintiff could state a claim for being forced to take unpaid leave—in this case because her accommodations were denied—if MHS's reason for denying those accommodations was retaliatory in nature. Thus, Plaintiff could assert that upon receiving her request for accommodations, MHS reacted so negatively to the request itself that it decided to punish Plaintiff by denying those accommodations. Such a theory would not "merely restate" a failure to accommodate claim, nor would it necessarily provide "redundant relief." *Cf. Pack v. Ill. Dep't of Healthcare and Family Servs.*, No. 13-cv-8930, 2014 WL 3704917, at *4 (N.D. Ill. July 25, 2014).

12

If, for example, a jury determined that Plaintiff was not a qualified individual under the ADA—because she could do her job without accommodations—she would lose her failure to accommodate claim. But that same jury might find that MHS denied those accommodations in bad faith—in other words, to punish Plaintiff for requesting accommodations, not because of its stated rationale.

On a close read of Plaintiff's allegations, the court finds she has pleaded sufficient facts to infer retaliation at this early stage of the case. Most notably, Plaintiff pleads that: (1) her attempts to negotiate accommodations were "ignored and disregarded" until she was hospitalized (FAC ¶¶ 34–35), suggesting that MHS did not take her alleged disability seriously; (2) MHS posted an open position for Plaintiff's job the day before meeting with her about accommodations (*id.* ¶¶ 41–42), suggesting that MHS did not intend to engage in good faith in an interactive process; (3) MHS denied Plaintiff accommodations by claiming she could not do her job although MHS had previously granted similar accommodations to another teacher (*id.* ¶¶ 47, 51–52); (4) MHS denied Plaintiff a case manager position that MHS said was not vacant, but Plaintiff claims was available (*id.* ¶¶ 53–54); and (5) MHS shortly thereafter agreed to accommodate Plaintiff, but only after she hired counsel (*id.* ¶¶ 69–71). Taken together, those allegations create an inference that MHS's motive for denying accommodations was retaliatory.

Of course, these are just the facts as Plaintiff has alleged them. As the case moves forward, MHS may well establish a different version of events. Or Plaintiff may be unable to tie MHS's decisions to her request for accommodations. At this stage, however, the court finds her allegations sufficient and denies MHS's motion.

Defendants separately moved to strike Plaintiff's request for "humiliation, embarrassment, and emotional distress damages" and other compensatory damages because "such damages are not available for retaliation claims under the ADA..." (Defs.' Br. at 10–11.) Plaintiff clarified in response that she is not seeking compensatory damages on her retaliation claim. (Pl.'s Opp. Br. at 12.) Emotional distress damages are, however, available for a discrimination or failure-to-

13

accommodate claim under the ADA. *See, e.g.*, *Riemer v. Illinois Dep't of Transp.*, 148 F.3d 800, 809 (7th Cir. 1998) (upholding emotional distress damages under the ADA). Because Plaintiff only seeks compensatory damages "to the extent available under law," the court does not find it necessary to strike any particular language from the complaint. If the parties believe there is still a live dispute about damages that needs to be resolved prior to summary judgment—for example, to facilitate settlement—the court is willing to consider a separate motion.

## CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss [39] is denied. Defendants are directed to file their answer on or before December 22, 2022.

ENTER:

Dated: November 22, 2022

_____
REBECCA R. PALLMEYER
United States District Judge